## WISE, Respondent, v. WABASH RAILROAD COMPANY, Appellant.

**St. Louis Court of Appeals, January 12, 1909.**

1. **PERSONAL INJURIES: Evidence of Extent of Injury: Expert Testimony.** In an action for damages on account of personal injuries, it was permissible to permit the plaintiff to testify that her ribs were broken although physicians who testified in the case did not so state; the testimony was to be weighed by the jury for what it was worth.

2. **CARRIERS OF PASSENGERS: Boarding Train: Negligence in Coupling.** In an action for injuries received by a passenger while attempting to board a train, where it was shown that at the time the passenger attempted to board the train it was not made up, but that the coach which the passenger attempted to board was prepared to receive passengers, with the portable footstep in place, that it was customary for passengers to board cars at that station before the train was made up, that the inspector of the train directed the plaintiff where to get on, it was not error to refuse an instruction on behalf of the defendant based on the theory that the train was not ready to receive passengers; there was no room for a finding of that fact.

3. ————: ————: ————: Contributory Negligence. Nor was it error for the court to refuse an instruction for defendant on the theory of contributory negligence on the part of the plaintiff in boarding the train before it was ready.

4. PERSONAL INJURIES: Aggravation of Injury by Negligence of Plaintiff: Physician's Instruction. In an action for damages on account of personal injuries, the plaintiff is not entitled to recover for any aggravation of the injury due to careless non-observance of the physician's advice. In an action for damages for injuries to plaintiff's foot, where it was shown that the plaintiff was instructed by her physician to use crutches for eighteen months and that she used crutches when about home, but walked out without them, this was not a substantial compliance with the directions of the physician, and it was error to submit to the jury an instruction whereby they might find a substantial compliance with the instructions of the physician.

Appeal from Audrain Circuit Court.—*Hon. Jas. D. Barnett*, Judge.

REVERSED AND REMANDED.

*J. L. Minnis* and *Robertson & Robertson* for appellant.

(1) The court erred in permitting the plaintiff to state that she had broken ribs, it not being shown that she had any special skill or knowledge upon the subject. Rogers on Ex. Test., secs. 3 and 4; Underhill on Ev., secs. 185-187; Wigmore on Ev., sec. 568. (2) The court erred in granting plaintiff's instruction 1. Defendant was not prepared to receive passengers upon the train and it was unnecessary for plaintiff to go upon it then for the purpose of taking passage, and in the absence of an invitation to do so plaintiff's voluntary entrance thereon was an assumption of all the ordinary risks incident to the coupling of the cars of the train together. A passenger by voluntarily going into a place where it is not necessary to go in the course of the passenger's transactions with the carrier, assumes the risk of such damages as are incident to being in such a place. Whalen v. Traction Co., 61 N. J. L.

606, 68 Am. St. Rep. 723; Watson v. Railway, 91 Me. 584, 64 Am. St. Rep. 271; Woodroffe v. Railway, 201 Pa. St. 521, 51 Atl. 324, 88 Am. St. Rep. 827; De Kay v. Railway, 51 Minn, 178, 16 Am. St. Rep. 692; Railroad v. O'Keefe, 168 Ill. 115, 61 Am. St. Rep. 68 and note; Railroad v. Morrow, 93 S. W. 162; Smith v. Birmingham R. Light & Power Co., 41 So. 307; Schepers v. Railroad, 126 Mo. 676; Railroad v. Johnson, 144 Ala. 361, 39 So. 376; 113, Am. St. Rep. 48. And in the absence of an invitation to board the train it was necessary that defendant's agents making the coupling should have seen plaintiff was in a place of danger and knowing this to have been able to have prevented the injury by the exercise of due care. Jones v. Railroad, 163 Mass. 245, 39 N. E. 1019; Earl v. Railroad, 77 Am. St. Rep. 516; Hurt v. Railway, 94 Mo. 255, l. c. 265. (3) The court erred in refusing defendant's instruction 11 and then giving it in a modified form. The plaintiff was under obligations to make use of all reasonable means within her power to effect a cure or minimize the damages. Sedgwick on Damages, sec. 201-2; Dougherty v. Railroad, 97 Mo. 647; State ex rel. v. Powell, 44 Mo. 436; Dietrich v. Railway, 89 Mo. App. 36; Elliott on Railroads, sec. 1804. And to follow the direction of the physician of her own selection was only an act of ordinary prudence on her part. This it was her duty to do and she cannot recover damages for the aggravation of the injury due to her neglect or disregard of his directions. Elliott on Railroads, sec. 1804.

*P. H. Cullen* for respondent.

STATEMENT.—This plaintiff was hurt while taking passage on one of defendant's passenger trains in the city of Moberly, in April, 1901, and instituted this action for damages. The injuries alleged and of which there is any proof, were three broken ribs and a rup-

ture of the ligaments between the bones in the instep of the right foot, in consequence of which the arch was permitted to drop below its normal position. There was evidence tending to prove these facts: plaintiff had purchased a ticket from Moberly to the city of Mexico, in Audrain county, intending to go by defendant's train which was due to leave the former city at nine-thirty o'clock in the evening. Shortly before that time she and a friend went to the station, passed through the depot building or passageway connected with it, saw the train she wished to board standing on a track immediately in front of the station, with a portable footstep on the ground below the steps of the coach she wished to enter, and passengers getting on said coach. When said train arrived at Moberly on its way to St. Louis from Kansas City, the custom was to couple to it a mail car which came to Moberly in another train about the same hour, and was taken out of the latter train at said point and coupled on the one plaintiff meant to go on, to be hauled to St. Louis. It was also customary to couple to the rear coach of the train plaintiff boarded, a parlor car which was brought from St. Louis to Moberly during the day and left standing in the yards until the train in question arrived, when it was attached to said train and made the return trip to St. Louis. The conductor and some of the witnesses testified the train was not yet made up, but they agreed passengers had boarded it and that it was usual for them to do so while the train stood at the station. The conductor, and at least one other employee of the company, saw plaintiff was about to get aboard and did not remonstrate. As a great contention is made against the first instruction granted for plaintiff, on the ground that it did not require the jury to find the train was ready or plaintiff was invited to enter, we will set out some of the testimony. A servant styled the Night Depot Master, said that after trains were made up he would go into the waiting rooms and call for passen-

gers; that he saw plaintiff and Mr. Reed, the gentleman who accompanied her to the station, going toward the car before he made the announcement and gave no warning to them not to get aboard. The conductor of the train said it was customary, as soon as his train drew into the station, for passengers whose destination was Moberly, to get off there, and usually a group of persons were standing near intending to take passage, who were allowed to do so immediately; it was the custom and practice to receive passengers on the train as soon as those already on who wished to leave it had alighted; on the evening of the accident other persons had boarded the train for St. Louis before he saw plaintiff and Mr. Reed; he had already received pas-. sengers; he saw Mrs. Wise and Mr. Reed going toward the train, from the time the train stopped until it started again, the steps were down, lights were burning and the train was at the usual place for taking passengers aboard; if plaintiff went from the point where he first saw her and went aboard, she did as persons usually did who intended to get on trains. A switchman who worked in the Moberly yards testified people began to get on the train as soon as it arrived at the platform and passengers for Moberly began to get off; the footstep was laid down and kept there continuously while the train was at the station; some passengers would get off for a lunch or to smoke, and get on again at any time; anybody could get on and off at any time, and the step was there as an invitation for them to get on and off; that was what the train stood there for. A car inspector was looking over the train at the time plaintiff arrived, and a supposed warning by him is much relied on in defense. He testified as follows:

"Q. Now what was your business there that night; describe to the jury what you would be doing around the train at the time? A. I was inspecting the train.

"Q.  State what you mean?  A.  Looking over the cars, commencing at the rear end of the train as it arrived in there from Kansas City, that part of the train. I would commence at the rear and come toward the head end where the engine would be cut off; I looked under the rear end of the platform to see the coupling was all intact, and then began looking over the wheels of. the first truck and part of that car, and when I rose up I met Mr. Reed and the lady; the lady was advancing a little ahead of Mr. Reed; she inquired of me was that the train for Mexico; I told her it was; I says, 'There's no rush, lady, take your time, we will give you assistance to get on the train; approach down to the other end of the car and there will be preparation made for you to get on the train;' I passing right along with her, she a little in advance of Mr. Reed all the while; I looked over the other truck and come to the steps; she approached to get on the train and she started up the train, Mr. Reed behind her or near her side; getting up to about the second or top step she became entangled in her skirts and stumbled or staggered around some little bit before she recovered; I don't think to the best of my knowledge she went clear down on the platform of the car, but, afterwards, after she come to herself and got herself straightened up she advanced into the car.  .  .  .

"Q.  You were inspecting cars?  A.  Yes, sir.

"Q.  And you say Mr. Reed and this lady come up there?  A.  Yes, sir.

"Q.  And the lady spoke to you?  A.  Yes, sir.

"Q.  Says, 'Is this the car for Mexico'?  A.  Yes, sir, 'Is this the train for Mexico?'

"Q.  You told her it was?  A.  Yes, sir.

"Q.  And she immediately proceeded to go on?  A. She advanced then to the east end of the car; she was near the west end of the car at the time and she advanced on to the east end of the car and went on the train.

"Q. Went on the train? A. Yes, sir.

"Q. That's all that was said? A. Yes, sir, that's all that was said; I told her if she would wait we would give her help; assist her getting on if she would wait.

"Q. You saw Mr. Reed there? A. Yes, sir.

"Q. You knew Mr. Reed was able to assist her. A. I knew that wasn't Mr. Reed's duty; we had a man there that performed that duty.

"Q. You know Mr. Reed well? A. Yes, sir.

"Q. He was down there at the depot every day helping passengers on and off the trains? A. No, sir, that is the first passenger I ever saw him help on the train.

"Q. You knew he was familiar with the operation of trains? A. He ought to have been; he was a citizen there.

"Q. You told the lady to wait and you would provide somebody to help her on the train? A. Yes, sir, the train wasn't made up.

"Q. What did Captain Reed say? A. I can't call to memory I heard him say anything.

"Q. Did you see the coach coming down then? A. The parlor car?

"Q. Yes. A. Yes, sir."

Just as plaintiff stepped from the portable step to the second step of the rear coach, at its east or front end, the parlor car was shoved with such violence against the rear end of the coach by a locomotive in making an automatic coupling, that plaintiff was thrown first against the railing around the platform of the coach she was getting on, next against the side of the coach and then down on the steps and platform. She testified three of her ribs were broken by the violence of the concussion, and that, in attempting to save herself from falling as she swayed backward and forward, she gave the instep of her right foot a wrench which caused something to break loose in it. She went to Mexico suffering from pain in her side and foot and

nausea.   When she arrived there she stopped at a hotel
and was laid up for five or six weeks.   A physician was
called who put liniment on her side and bandaged her
foot.   She said she felt the ends of the broken ribs
rubbing against each other.   Two physicians testified
for her without confirming her statement regarding the
fracture of the ribs, but without denying it.   One of
them, who treated her foot three months after the ac-
cident, testified there was soreness in the left side be-
tween the seventh and ninth ribs, but he found no
crepitus, lump or other sign of fracture.   The other
physician said nothing about the rib injury.   The ex-
pert testimony of three physicians was that fractured
ribs would produce more pain than plaintiff's testimony
indicated she suffered, and two of them said a lump
or enlargement would remain where the fractures re-
united.   Plaintiff's side was much swollen and contin-
ued to be for weeks and, according to her statement,
she endured considerable pain from it.   The injured
foot gave the more serious trouble and though the ac-
cident happened in April, 1901, she continued lame from
said date to the date of the trial in February, 1906.
Testimony was given that she limped some before the
accident happened, but as to this different inferences
are possible.   In June, about three months after the
accident, she consulted a physician in Kansas City who
treated her foot off and on for two years.   He testified
the ligaments of the foot were ruptured, and the injury
was a serious one, and he directed her to use crutches
in walking for at least eighteen months.   Other phy-
sicians testified the foot injury was serious and per-
haps permanent and all the testimony on the issue went
to prove she had never ceased to limp.   But she swore
herself she did not follow the advice of her physician
to use crutches and though she used them for eighteen
months when in the house, she discarded them when
she went out.   Moreover she did not use them before
she consulted the Kansas City doctor.   Every physician

who was a witness said the injury to the foot would be aggravated by bearing the weight of the body on it and that the use of crutches would facilitate recovery and was, perhaps, indispensable to it. Her main doctor said he had examined her the day before the trial and was surprised not to find more improvement, but that he still hoped for a permanent cure. We quote the doctors' advice and her testimony:

"Would you consider that injury, as you have described it, as a permanent injury? A. It is an injury that is hard to remedy—I mean hard to get well, because the foot is a place where it is mighty hard to keep off it altogether and anything which would—any weight of the body thrown on the arch would, of course, tend to keep the bones separated, so that the ligaments could not be united—that is all there was to that. That is a difficult thing, healing any sprain. . . .

"Q. How long did she stay on crutches? A. My instructions were she should stay on crutches at least eighteen months.

"Q. Until the foot got well? A. Yes, my idea was to get it well. I never dreamed of a suit when I put the woman on treatment—such a thing never entered my head.

"Q. Taking your actual experience and your knowledge that you gained in your profession in reference to injuries of this sort, if she had followed your instructions, take that foot, as you instructed her to, and kept it from use and pressure, what would you say about its getting well? A. They frequently do get well, Mr. Sebree—there is no doubt about that, and I would say that she stood a good show of getting perfectly well, if she could have been—or if you or I or anybody else—if we could keep off of our injuries, yes.

"Q. No reason you say why she should not recover? A. No, sir.

"Q. Were there any bones broken in the foot? A. I don't think so, sir. The bones, seemingly, were in contact.

"Q. It seemed to have been a sprain? A. Yes, a tearing of the ligaments, what we call a sprain.

"Q. And the treatment was to give them a chance to reunite? A. Yes, sir, to unite again.

"Q. When did you last examine the foot? A. Yesterday.

"Q. What condition did you find it in then? A. It was not well, to my surprise—I say, it is not well. I was in hopes it would be better.

"Q. You thought it would be? A. Yes, sir, I was in hopes it would be better.

"Q. Can you give us an idea about its present condition? A. She is not able to stand weight on it or to bear pressure, you understand, on the ball of the foot, so as to put any tension on the foot, like standing, or in walking, without pain.

"Q. Have the ligaments reunited? A. I would not say they were, positively. There would be no pain if they were.

"Q. But you could tell to what extent they had reunited? A. No, sir, no man can.

"Q. If the foot is rightly treated in the future— A. She would get well—probably she will get well some of these days, but I do not—

"Q. Is it proper treatment for her to be walking around on that foot? A. I have limited the walking, tried to, absolutely.

"Q. But she does walk through here, and walked around here today? A. It is going to do her harm; yes, no doubt of that.

"Q. And in not following your instructions not to use the foot, but to protect it with a crutch, why she has not been following the best method of treatment? A. She ought to relieve that foot of all pressure.

"Q. And ought to have done it from the time you first saw her? A. Yes, sir."

Plaintiff testified:

"Q. Now you don't walk with a crutch. A. No.

"Q. Never have for any length of time? A. Yes, I did for a long time.

"Q. How long? A. Oh, I guess about eighteen months; out doors though I never did; I didn't go out very much, but when I came out I came without it because it was so awkward.

"Q. Now you go to church every Sunday and have all this time? A. I try to go every Sunday.

"Q. You go to other places; you go to the opera house? A. No, sir.

"Q. Haven't you in the last five years? A. I believe I have been once or twice; I went in a carriage.

"Q. You go around and visit your friends, don't you? A. I have not been any place scarcely at all in five years.

"Q. You go out quite a number of places, don't you? A. I go in a carriage, I ride.

Q. You walk to and from the carriage? A. Yes, sir. I walk around this block sometimes, and that's the extent of my walking."

In substance the negligence alleged in the petition was running the parlor car against the train plaintiff was boarding with such violence as to cause her to lose control of her movements, throw her against the railing on the side of the car and then down, inflicting the injuries stated. Besides a general denial, the defenses interposed were that plaintiff contributed to her injuries by attempting to get on the car while the train was in motion and before it was ready for passengers, and while attired in a dress having a long train which impeded her movements; that defendant was compelled by the Federal statutes and the direction of the Interstate Commerce Commission, to use cars with automatic couplers on its trains, which cars increased the

Wise v. Railroad.

hazard of getting on or alighting from trains; that the impact of the parlor car against the coach plaintiff was entering was no more violent than was necessarily incident to coupling the two cars automatically; that plaintiff saw the parlor car about to be coupled to the coach and, with knowledge of the risk, attempted to step aboard at the moment of the coupling. Plaintiff denied observing the coupling was imminent when she stepped on the coach and said she had not seen the parlor car. Testimony was adduced for defendant which, perhaps, might support an inference that the impact of the two cars had nothing to do with plaintiff's injuries, whatever they were, but her fall was due to catching one foot in her dress as she ascended from the portable footstep to the step of the coach and that she was not hurt at all, or very little. A verdict was returned awarding plaintiff five thousand dollars, but she remitted five hundred dollars, and an appeal having been allowed to the Supreme Court, said court transferred it here. .

GOODE, J. (after stating the facts).—It is assigned for error that plaintiff was permitted to testify her ribs were broken in the accident, the argument being that no one but an expert physician was competent so to testify. What plaintiff testified regarding this matter was admissible, for she said she positively knew her ribs were broken and felt the ends of them rubbing against each other. The weight of her testimony was for the jury and it was the privilege of counsel for defendant to cross-examine her for the purpose of discrediting either her knowledge or truthfulness; a privilege they utilized in full measure. The case of Ferguson v. Davis Co., 57 Ia. 601, is directly in point on this ruling and we approve of its reasoning and conclusion. A party to an action might testify corruptly

or mistakenly about a rib or other bone in his body being broken, as he might about any other fact, but such an injury is not so obscure as to lie beyond the pale of common testimony and depend entirely on the opinion of experts.

The first instruction granted for plaintiff is questioned for omitting to require the jury to find the train was ready for the reception of passengers when plaintiff got on, or that she and others were invited, expressly or impliedly, to get on then. The petition alleged that when the train arrived at Moberly and the passengers it was carrying for said station had alighted, all persons who desired to take passage were "by defendant invited and led to believe they could then and there enter and get aboard the train." This averment was traversed by the general denial and is said to have been an issuable fact on which an affirmative finding was essential to a verdict for plaintiff. If the issue was introduced into the case by the pleadings, it was eliminated by the testimony. We could not hold there was any room to find the train was not ready to receive passengers, or they were not welcome to enter when plaintiff attempted to do so, without disregarding all the evidence on the issue. The supposed warning of the car inspector against her getting on the train was nearly an express invitation for her to get on, as the position of the train and the footstep, and defendant's habit of receiving passengers, were an implied invitation. The inspector told plaintiff to go to the east end of the coach and there would be preparation made for her. She did as he directed, saw the footstep and coach were prepared to receive passengers, and got on in the inspector's sight without further caution or word from him. The inspector said nothing to warn plaintiff of a jostle when the parlor car was coupled, though he saw its approach; and, clearly, he was not thinking of danger from that source. He said some one would assist her, but she had Mr. Reed to do that. Neither what

the inspector said, nor any other fact in evidence, goes to prove passengers were not being received on the train or that no invitation was extended to plaintiff to get on, but all the evidence is the other way. In instructing the jury a court may take for true a fact which is admitted, or proved beyond doubt by the uniform testimony for both parties. [Fields v. Railroad, 80 Mo. 203, 206; Rive v. McFarland, 41 Mo. App. 489, and cases cited on page 496.]

The exception to the first instruction is the main challenge of the theory on which the case was submitted to the jury, and what we have said in disposing of it disposes, too, of most of the other exceptions and of one much insisted on.; namely, that the court erred in charging the jury, in an instruction requested by defendant, that if it was defendant's custom to run train No. 6 (the one plaintiff got on) up to the Moberly depot to allow passengers to alight from it and get on it, and then proceed to make up a new train for St. Louis by attaching additional cars, and while making up such new train it did not invite passengers to get on train No. 6, but afterwards had the station master call for passengers for it, and plaintiff undertook, while said train was being made up, to get aboard, and was told the train was being made up and she would have time to get on, but nevertheless undertook to do so while the cars were being coupled together to form a new train, plaintiff was not entitled to recover, even though the defendant made a harder jerk or bump in coupling than was necessary. The court amended this instruction by adding to it this clause: "Unless you (the jury) further find from the evidence defendant's agents making said coupling saw, or, by the exercise of reasonable diligence, might have seen plaintiff was in the act of getting on the train." The hypothesis of the instruction, i. e., that passengers were not invited to get on the train while other cars were being attached to it, was opposed to all the testimony and should not

have been given on the present record, either as asked
or as altered. The amendment is said to have taken
out of the case the defenses of contributory negligence
and assumption of the risk; but this it did not, except
in so far as those defenses were based on the theory
that plaintiff's attempt to board the train was prema-
ture. If she omitted ordinary care for her own safety
in the manner of her attempt, or if it was made when
she knew, or, in reason, ought to have known, a jar
of such violence was imminent as would deter a person
of ordinary prudence from the attempt, defenses on
those facts were open to the company. That is to say,
the company was not precluded from asserting she
caused or contributed to the injury by carelessness (for
instance, carelessly getting entangled in her long dress)
or by stepping on the coach when it was apparent the
parlor car was about to be shoved against it with dan-
gerous violence.

Defendant's contention that the use of cars which
coupled automatically was compelled by law, and the
jar of coupling in this case was no greater than is in-
cident to such couplings when carefully made, were
given full force in the instructions to the jury. No
absolute defense arose out of those facts, if both were
true, and the second one may be disputed. However, if
the coupling was effected without needless violence,
there is room for a finding that it was negligent con-
duct to admit passengers on 'the rear coach while the
coupling was in progress; and, indeed, if the movement
was bound to hurl an embarking passenger about as
plaintiff says she was, defendant's conduct was incom-
patible with the high care common carriers must take
of passengers. [Huelsenkamp v. Railroad, 37 Mo.
537; Clark v. Railroad, 127 Mo. 197.]

An exception was taken to a change made by the
court in an instruction requested by defendant which
dealt with the treatment of plaintiff's foot and her ob-
servance of the advice of the physicians who treated

her. The jury were told in the eleventh instruction for defendant, that if they found plaintiff did not have proper treatment applied to her foot; that her Kansas City physician ordered rest for the foot and the use of crutches in walking as necessary to a cure, and further found a cure could have been effected by following his advice, and plaintiff failed for any cause *substantially* to follow his directions, and the subsequent condition of the foot was due to her disregard of his advice, then, even though defendant was found to be liable, the jury could not allow plaintiff anything on account of the condition of her foot as the result of her own fault, but should allow her only such damages for the injury to it as were the direct result of the injury under proper treatment and care on her part. The court changed said instruction from the form in which it was requested by inserting the word "substantially," so as to require the jury to find only that plaintiff failed substantially to follow the physician's directions. This amendment is said to have been erroneous. In another instruction dealing with the same matter, the court told the jury that when a person was injured by the fault of another, it was the duty of the injured person to use all possible means in his power to effect a cure, and plaintiff was bound to do this; that defendant could not be held liable for any condition or aggravation of her injury resulting from want of proper treatment, or negligence on her part, or failure to follow the advice of her physician; and though the jury might find plaintiff had been injured, yet in no event could defendant be liable for the condition of her foot due to walking without crutches, or failure to give it rest, or follow the direction of her physician. Plaintiff was not entitled to recover for any aggravation of the injury to her foot due to careless non-observance of the advice of her physician about keeping her weight off it. [Railroad v. Denson (Texas), 72 S. W. 70; Strudgeon v. Sand Beach (Mich.), 65 N. E. 617; Zib-

bell v. Grand Rapids (Mich.), 89 N. E. 563.] From the stress laid by one of the physicians who testified on the prescribed regimen as being essential to a cure, there hardly could be substantial compliance without keeping pressure off the foot as much as was possible. The seventh instruction contained nothing of which appellant can complain and was, perhaps, over-favorable to its contention in excluding an award of damages for aggravation of the injury to the foot due to plaintiff's walking without crutches, or failure to follow her doctor's advice, whether she did so negligently or necessarily. It was not intended to exact literal observance of the advice in one instruction and only substantial observance in another, and, therefore, the seventh instruction must be construed with the eleventh. Though as a general proposition of law no more than substantial observance is required, the charge to that effect in the case at bar was misleading because it authorized the jury to find plaintiff substantially followed her physician's advice, whereas her own testimony showed she did not. Her statement that she used crutches for eighteen months in the house, but not when she went outside; that she sometimes walked around a block of the town, went to church on Sunday, visited her friends in a carriage, walking to the carriage from the house and back without crutches, show beyond question she fell short of substantial compliance with the physician's direction. Moreover, he told her she must stay on crutches at least eighteen months, adding he meant until the foot was well; and he said she was doing harm by walking without them at the time of the trial. From the entire testimony it obviously was necessary for her to use crutches until her foot was well. The omission to use crutches to the extent she did was a disobedience of the physician's order, and one the jury might find was careless; for plaintiff's excuse for her conduct was not the com-

pulsion of some necessity, but that crutches were awkward.

The judgment is reversed and the cause remanded. All concur.