PRESTON BURGESS, by His Next Friend, H. S. BURGESS, Respondent, v. B. W. GARVIN and L. B. PRICE MERCANTILE COMPANY, Appellant.*

Kansas City Court of Appeals. February 9, 1925.

1. MASTER AND SERVANT: Respondeat Superior: Burden of Proof Was upon Plaintiff to Show Relationship of Respondeat Superior Existed. In action for damages against employer for injuries caused by another under the doctrine of *respondeat superior*, the burden of proof was upon plaintiff to show agency and to produce evidence from which it could be reasonably inferred that relationship of *respondeat superior* existed.

2. ———: ———: Whether Relation of Respondeat Superior Existed is a Question of Mixed Law and Fact. Whether relation of *respondeat superior* existed is a question of mixed law and fact, but facts and all proper inferences to be drawn therefrom are to be determined by jury under proper instructions.

3. ———: ———: What Constitutes "Independent Contractor" Stated. An independent contractor is one who carries on an independent

business and contracts to do a piece of work according to his own methods and without being subject to the control of his employer as to means by which result is to be accomplished, but only as to result of work.

4. ——: ——: Independent Contractor: Test of Relationship is Right to Control. The test of relationship is right to control; it is not the fact of actual interference with the control but the right to interfere that makes the difference between an independent contractor and a servant or agent.

5. ——: ——: ——: One Subject to Control or Direction as to Result of Work is an Independent Contractor. Where one claimed to be employee is merely subject to control or direction of one claimed to be employer as to result to be obtained, he is an independent contractor, but if he is subject to control of the other as to the means, he is not an independent contractor.

6. ——: ——: ——: Mode of Payment not Controlling in Determining Whether an Employee is an Independent Contractor. While the mode of payment is an element to be considered in determining whether an employee is an independent contractor, it is not controlling nor the test; neither is the fact that agent used his own car in his master's business.

7. ——: ——: ——: Whether Relationship Between Mercantile Company and Salesman Existed Held for Jury. Whether relationship between mercantile company and employee, a canvasser selling goods on commission for it, upon contracts taken in its name and turned over to it, and who at time of plaintiff's injury was breaking in another, was that of *respondeat superior*, making company responsible for his negligent running into plaintiff, *held* for jury.

8. ——: Slight Deviation from Master's Business Does Not Take Servant Out of Scope of Authority. A slight deviation from the master's business does not take the servant from without the scope of his authority.

9. ——: Canvasser Soliciting Business for Company Held Acting Within Scope of His Authority at Time of Plaintiff's Injury. Where canvasser in soliciting business, used his own automobile with company's consent, and when finishing day's work would take automobile with company's goods to a private garage where they would be stored for the night, and who, at time of plaintiff's injury was on his way to garage, *held* that he was acting within scope of his employment, even though it was his purpose to stop at another garage to have a tire repaired.

10. **NEGLIGENCE:** Evidence Held Sufficient upon Which to Submit Case to Jury under Humanitarian Doctrine. In action for injuries to. boy as result of being struck by automobile, evidence *held* sufficient upon which to submit case to jury under humanitarian doctrine.

11. **WITNESSES:** Reading of Deposition and Cross-Examination of Witness as to Answers Contradictory to His Testimony at Trial, Held Proper. Answers of witness for defendant, given in his deposition, *held* to contradict his testimony at trial, and plaintiff's cross-examination of witness as to such answers and reading deposition in full to jury was proper.

12. **EVIDENCE:** Grades of Roads and Streets is a Matter of Common Knowledge Not Requiring Survey by Expert to Determine. The matter of grades of roads and streets is one of such common knowledge and observation that it does not require a survey by an expert to determine what such grade ordinarily is.

13. ———: Testimony as to Percentage of Grade of Street, Held Proper, Though Witness Had no Experience in Surveying or Engineering. Testimony of father of boy struck by automobile that grade of street on which collision occurred was about three per cent held proper, though he had no experience in surveying or engineering, where he stated that he understood percentage of grade to mean so many feet in 100.

14. ———: Testimony in Rebuttal Contradicting Testimony of Physicians as to Taking of X-ray Photograph, Held Proper. Where physicians, who had examined plaintiff, testified that no X-ray photograph had been taken of plaintiff's injury, *held* trial court did not abuse its discretion in allowing plaintiff's mother to testify in rebuttal that one of such physicians took plaintiff to an X-ray specialist for an X-ray photograph.

15. **INSTRUCTION:** Instruction for Plaintiff Covering Entire Case and Directing a Verdict, Held Not Erroneous. Plaintiff's instruction covering entire case and directing a verdict, *held* not erroneous as ignoring defendant's theory of defense that plaintiff ran into automobile .

16. **NEGLIGENCE:** Even Though Child Was Injured by Running into Side of Automobile, He Was Entitled to Recover if Driver Could Have Avoided Collision. Even if plaintiff ran into side of automobile, he was entitled to recover if he was oblivious of its presence which driver saw, or could have seen in time, and failed to swerve automobile aside or sound warning in time to avoid collision.

17. **INSTRUCTION: Where Case Submitted under Humanitarian Doctrine an Instruction on Contributory Negligence Was Properly Refused.** Where case was submitted under humanitarian doctrine, an instruction which told jury that if plaintiff was guilty of contributory negligence he could not recover, *held* properly refused.

18. **————: Instruction Which Was a Comment upon the Testimony Held Properly Refused.** Refusal of defendant's instruction seeking to submit to jury legal effect of defendant's exihibit in form of chattel mortgage, used by defendant's salesman in selling its goods, and which did not contemplate signing of it by defendant company, *held* properly refused as it would have been a comment upon the testimony and leave the inference that salesman was not in the employ of defendant.

*Corpus Juris-Cyc. References; Evidence, 22 C. J., p. 566, n. 29. Master and Servant, 39 C. J., p. 1297, n. 12; p. 1315, n. 1; p. 1316, n. 7; p. 1317, n. 8, 11, 12; p. 1321, n. 68; p. 1322, n. 82; p. 1355, n. 82; p. 1362, n. 18; p. 1364, n. 32. Negligence, 29 Cyc., p. 641, n. 22; p. 655, n. 36; p. 1530, n. 15. Trial, 38 Cyc., p. 1357, n. 36; p. 1634, n. 15; p. 1673, n. 42. Witnesses, 40 Cyc., p. 2744, n. 60.

Appeal from the Circuit Court of Jackson County. —*Hon. Charles R. Pence,* Judge.

AFFIRMED.

*Swearingen & Finnell* for respondent.

*Ryland, Boys, Stinson & Mag* and *R. E. Ball* for appellant Price Mercantile Company.

*Clarence L. Hogin* for defendant Garvin.

BLAND, J.— This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $5,000 and defendant has appealed.

The facts show that plaintiff was injured between 2:00 and 3:00 P. M. on the 18th day of May, 1920, by being struck by an automobile being driven by the defendant, Garvin, at 5th and Troup streets in Kansas City, Kansas. Defendant, L. B. Price Mercantile Company,

insists that its instruction in the nature of a demurrer to the evidence should have been given because, first, there was no evidence tending to show that any relation of *respondeat superior* existed between it and its co-defendant; second, if such a relation was shown, its co-defendant was acting without the scope of his authority at the time of the collision, and, third, there was no evidence upon which to submit the case to the jury on the humanitarian doctrine, or upon any other theory. Defendant, Garvin, adopts all the points made vy his co-defendant except those inapplicable to him.

We shall first state the evidence on the question as to whether the relation of *respondeat superior* existed between the defendants. The evidence shows that Garvin was employed by his co-defendant to sell on commission certain goods handled by defendant mercantile company, which consisted of small rugs, curtains, silverware and household specialties, and in carrying out this work Garvin used an automobile owned, controlled and operated by him at his own expense. It was while operating this automobile that he struck plaintiff, as aforesaid. One Farr was riding with Garvin at the time of the collision and had been with him all of that day transacting the business in which Garvin was engaged in Kansas City, Kansas. There was testimony that Farr was being "broken in" by Garvin, that the former was in the mercantile company's "organization" and that Garvin paid Farr a part of the commission on sales made by Farr. On the morning of May 18, 1920, Garvin and Farr went to the place of business of the mercantile company in Kansas City, Missouri, about eight or eight-thirty, where they procured a load of merchandise consisting of miscellaneous merchandise such as small rugs, curtains, silverware, etc. At the time of the collision Garvin had 250 pounds of these goods in the back end of his car, which was a five-passenger Ford automobile.

The canvassers of the mercantile company were required to take contracts in making sales, variously called,

"leases," "mortgages" and "contracts." One of the contracts that was furnished Garvin and the other canvassers is a form of a chattel mortgage. The canvassers would sell goods on payments and take back from the buyer a mortgage for the part of the purchase price unpaid. These mortgages would be made in favor of the L. B. Price Mercantile Company. The one introduced in evidence (Exhibit 7) recited that it was taken for the balance of the purchase price of the property therein described and that the payments should be made to the Price Company; it provides against selling or removing the property and if default should be made in payment of any indebtedness of the mortgagor or any attempt to sell or attempt to remove the property, that it should be lawful for the mercantile company to take possession of the property and sell the same. It also recites "as further security, the undersigned also sells, assigns and transfers to said Company, all the salary, wages, commission, and demands due and to become due to me" as security for the payment of the indebtedness. At the bottom appears the following under the head of "NO-TICE."

"*Our canvassers* are directed to take a contract from every customer. They have NO AUTHORITY to make any verbal contract with respect to the property herein contracted for. See that the price of the goods and the amounts credited on this lease correspond with your receipt. Our collector will show you the lease bearing your signature. Money paid to any other person is paid at your own risk." (Italics ours.)

Farr testified—

". . . I was in the *employ* at that time of the L. B. Price Company; my business was that of a *salesman;* Mr. Garvin was in the *employ* of the same firm in the *same* business; we were out on the business of the company that morning; we were selling house specialties; . . . we deliver goods, but make no collections; did not take any telephone orders or answer telephone

calls to go to Kansas; other parties from the Price Mercantile Company would go and make the collections; do not remember that I ever sold for cash; sometimes took part payments with the orders; kept the money, using it at the time; didn't turn it in to the company; all that first payment went to the salesman; after that the payments went to the house; the salesman had no interest in the collections after the first payment; we got commissions, but that was paid after collecting on them; I do not remember of taking any orders without a first payment; . . . My compensation from the Price Company was just a percentage, no salary. The contract of sales was signed by the customers; do not know that it was signed by the company; I turned all of the contracts I took in to Mr. Garvin and he turned it in to the company, I believe; that was the business that I was in on that day, selling goods and making contracts."

W. C. Wall, field manager of the defendant company, testified that Garvin was "selling goods." *soliciting for the company* in May, 1920," that—

". . . 'The goods are consigned to the men on regular consignment slips and they take them out in their cars and when they are sold chattel mortgages are turned in to us and they are paid commissions on their sales. In places they use samples and in other places they take the stock. I don't know how it was with Garvin on May 18, 1920. They return what goods they don't sell.' There was nothing in the arrangement with Garvin as to his going from place to place; he is his own free lance or boss in that respect; there was nothing at all about how many customers he should see during the day and nothing as to whom he should solicit; there was no district or locality assigned to him; that day I believe it was reported he was in Kansas City, Kansas; when Garvin started to work for us I think he had a car, maybe bought it later on; I do not know anything as to what he did that day; I know very little about witness Farr. I think Garvin hired him, got him to come to work down

there; the L. B. Price Mercantile Company did not hire Farr; . . . Mr. Garvin returned goods that he had left, that was on his hands and unsold, and got credit for them; I don't remember of Mr. Garvin's employing anybody except Mr. Farr; Mr. Garvin could hire men to work for him; Mr. Garvin was required to have instruments, or contracts, like Exhibit 7 for his customers; when signed they were turned in to the house and they go to record there; Mr. Garvin had nothing to do with them after they were filed; he had nothing to do with accounts after they were turned in; our regular authorized collectors collect on them; at times we repossess ourselves of the goods; all salesmen were treated the same. Mr. Garvin did not have any specified territory; he was not turned loose more than other salesmen were; he worked wherever he pleased; salesmen generally have authority to take contracts wherever they go; we are licensed to do business in Kansas; I don't know how many salesmen were in Kansas in May, 1920; I was manager at that time; salesmen work over in Kansas sometimes and sometimes on this side. Q. Did Mr. Garvin in making those trips over there with goods for sale come back and turn goods back to your company and get credit for them? A. If he was checking in, he would, yes. Q. What do you mean by checking in? A. Going to quit and go to work for somebody else, he would turn goods back to us that were consigned to him. Either that or pay us for them; he had the right to turn back unsold goods; if he did so would give him credit for them; . . . Q. I want to ask you if at the time the deposition was taken you didn't say we had a Mr. Alexander Farr? A. Mr. Alexander Farr was in the organization. 'Q. What was the nature of his employment and didn't you make this answer, Same as Mr. Garvin, he was working on Mr. Garvin's car? A. If it's down there I said it. Q. That's the way you said it? A. Yes. Q. I will ask you if this question was asked and this answer made. Question. 'Was he ever fully broken in and turned over

territory. A. Yes, sir.' A. I don't believe he ever was. Q. Did you make that answer? A. You have got it down there. He only worked a short time for us at that time and as I remember he never had a stock of our goods out on his own. . . . the goods are con-. signed to these men and they take them out and sell them; they are commissioned merchants and they report the business to us; the goods are charged to them and are checked out to them. The goods that are set aside and charged to Mr. Garvin are for him to sell; if they are not sold they are turned in and his account credited; he gets a commission on whatever sales he makes, then the goods that he sells are charged to the party to whom he sells them; we have lease forms that we use down there; all the salesmen use the same form; the salesmen do not make any collections at all except possibly cash sales; if a customer of Garvin's should get behind at times he goes to see that person to see if he is dissatisfied and to urge him to pay up; if one of his customers fails to pay, the commission charged back to Mr. Garvin; that was the practice in May, 1920; usually men *who own cars* take men like Mr. Farr on and they work with them; usually *the man who owns the car gets a certain per cent of the business that* that is put in off that car; that was the case with Garvin and Mr. Farr.''

Garvin testified—

''The Price Mercantile Company knew I was using the car that day; I do not know whether they knew or not that I was breaking in Mr. Farr; I do not know how many people I visited in Kansas City, Kansas, that day; . . . 'Well, I expect I visited fifty peopde over there, I don't remember the names of any one of them. . . . I am not positive how many, it may have been fifty. I have been working in Kansas City, Kansas, for about fifteen years; I am familiar with the location of Fifth and Troup;'

''Were any directions ever given you by the Price Mercantile Company about this car? A. The Price Mer-

cantile Company had nothing to do with my car. I
bought the car and paid for it.''

He further testified that he kept the automobile at
a garage at 12th and Charlotte and that he lived nearby;
that he always quit work at three o'clock but that he
''knocked off'' business a little earlier that day on ac-
count of the fact that he wanted to get a leaking tire
fixed before he drove to the garage; that he determined
to quit for the day when at Fourth and Woods streets,
about three blocks away from the place where plaintiff
was hurt; that he was on his way to a garage between
Troup and Virginia on Fifth street to have his tire
fixed when he ran into plaintiff; that after having the
tire fixed it was his intention to proceed to the garage
where he kept his car. He further testified that Farr
was working for him at the time; that not over ten min-
utes had elapsed between the time he decided to quit for
the day and the time of the collision. After the colli-
sion he was arrested and taken to the police station and
afterwards he went home. He transacted no other reg-
ular business after the collision. In fact, he testified
that he did no more soliciting work after determining
to quit for the day.

Defendant company insists that Garvin was an in-
dependent contractor, stating—

''. . . Garvin was an independent merchant
in exactly the same relationship toward the defendant
company as a merchant with a store, who took goods on
consignment and sold them, taking his profit from the
goods that he sold and not being required to pay for
those which were not sold. The merchant's store would,
of course, be fixed, stationary, but Garvin's automobile
was his store which moved from place to place and
sought the customer instead of waiting for him. Instead
of paying rent he paid for the upkeep of his machine.
. . . Garvin was master of the manner, of the
time and of the place where defendant's goods should be
sold, being responsible only for that proportion of the

sale which came to the defendant under the contract. He was an independent dealer engaged in a business of his own and responsible only for results, being wholly uncontrolled as to the manner, time or place of performance of his contract, by the company defendant.

"He was absolutely his own boss as to when, how and where he worked, was, therefore, working not for the defendant, but for himself. He was not paid for the time that he put in, but for the results that he obtained. The details, the manner, the place, the time when he worked, he, not his co-defendant, determined. Whether he went around by automobile, carried the goods on his back or how he got them before the view of his customers was determined wholly and only by him, With where the goods were kept or how they were kept, the defendant had nothing to do. Garvin did not return them at night. They were consigned to him and he was responsible for the goods or a sale—for the result and not the means of accomplishing it."

The law in relation to cases of his kind is well settled but its application to a given state of facts is not always easy. Most of these cases are close on the facts. A citation of a few pertinent authorities will throw some light upon the matter.

The burden of proof was upon plaintiff to show the agency of Garvin. It was necessary for plaintiff to produce some evidence from which it can be fairly and reasonably inferred that the relation of *respondeat superior* existed. [Robinson v. Clevenger, 111 Mo. App. 622.] The question is one of mixed law and fact but the facts and all proper inferences to be drawn therefrom are to be determined by the jury under proper instructions.

An independent contractor is one who carries on an independent business and contracts to do a piece of work according to his own methods and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the

result of the work. The test of the relationship is the right to control; it is not the fact of actual interference with the control but the right to interfere that makes the difference between an independent contractor and a servant or agent. If the one claimed to be the employee is merely subject to control or direction of the one claimed to be the employer as to the result to be obtained, he is an independent contractor, but if such a person is subject to the control of the other as to the means he is not an independent contractor. [26 Cyc., pp. 1546, 1547, 1548; 14 R. C. L., pp. 67, 68; State ex rel. v. Trimble, 250 S. W. 384; State ex rel. Dick & Bros. Quincy Brewery Co. v. Ellison, 229 S. W. 1059; Vaughn v. Davis & Sons, 221 S. W. 782; Simmons v. Murray, 234 S. W. 1009; Karguth v. Coal & Coke Co., 253 S. W. 367; Williams v. National Cash Register Co., 157 Ky. 836.]

"One text-writer declares such contractor to be one who undertakes to do specific pieces of work for other persons, without submitting himself to their control in the details of the work, or one who renders the service in the course of an independent employment, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished. [1 Shear. & R. Neg. ## 164, 165.]" [Waters v. Pioneer Fuel Co., 52 Minn. 474, 477.]

While the mode of payment is an element to be considered in determining whether an employee is an independent contractor; it is not controlling nor is it the test. [26 Cyc. 1551; 14 R. C. L., p. 74; Vaughn v. Davis & Sons, supra; Hoffman v. Liberty Motors Co. (Mass.), 125 N. E. 845; Long Ben v. Eastern Motor Co. (N. J.), 109 Atl. 286; Singer Mfg. Co. v. Rahn, 132 U. S. 518; Williams v. Cash Register Co., supra, l. c. 845.] Neither is the fact that the agent uses his own car in his master's business. [Gordner v. St. Louis Screw Co., 201 Mo. App. 349; Berry on Automobiles, section 1196.]

If the relationship between Garvin and defendant company was that of *respondeat superior* in reference to

the work in which he was engaged on the day of the collision, the mercantile company is responsible for his negligent running into plaintiff as under the facts there-is no question but that there was at least an implied agreement that he might use the automobile. [Lewis v. National Cash Register Co. (N. J.), 87 Atl. 345; Dishman v. Whitney (Wash.), 29 A. L. R., 460.] The question then hinges on the right of Garvin's co-defendant to control the method of the work being done by him, whether there was any actual interference with the work or not.

Both Garvin and Wallis appear to have been very anxious to protect the defendant company in this case. At the trial both changed in a degree their testimony as given in their depositions in reference to the relation existing between Garvin and his co-defendant, the testimony at the trial being more favorable to the latter than that given in the depositions. Wallis's effort to make it appear at the trial and the company's contention now that Garvin was an independent merchant selling goods merely upon consignment is, of course, wholly unreasonable. While Garvin may have the right to solicit business at times and at places wholly within his own discretion and while his co-defendant did not have any interest in Garvin's automobile, yet when the goods were delivered to Garvin by the defendant company for selling by him, the agreement was not merely that he remit to the company the price of the goods when he sold them. (He sold these goods on "contracts," "leases" or "mortgages" such as the one we have described. Blank forms for these were furnished by the defendant company and if Garvin did not collect the entire purchase price at the time of the sale, and there is an inference from the evidence that this was seldom done, he took a mortgage back for the unpaid purchase price, not to himself but in favor of his co-defendant. Thereafter Garvin had nothing whatever to do with making actual collections of the unpaid balance but his co-defendant made these collections, using any means it saw proper, including the bringing of suits and the regaining of possession of the

goods. Garvin's authority was limited, he was directed to take contracts from every customer and had no authority to make verbal contracts or to collect payments without having the "lease" in his possession. If the result of the sale was that the entire purchase price of the goods was not finally paid, Garvin did not lose the entire amount but only his commission.

What was the "result" that Garvin was called upon to accomplish? The answer is simple; to effect the sale of the company's merchandise. The details of how the sale was to be accomplished, rather than the time and place (which are not conclusive, Fitzgerald v. Caldwell, 207 Mo. App. 514), were controlled by the company. Garvin could make sales only by contracts furnished by the company. He could not make verbal contracts. These contracts were in the name of the company and for its benefit. Whose work was Garvin carrying on when these contracts or mortgages were taken? They were taken for the benefit of the company. Garvin had nothing further to do with them except to turn them over to the company. He was selling the company's goods not his own although, of course, being in possession of them he had to account for them.

It seems that the only thing left to Garvin was the time and place of making the sale and possibly what he should say to the prospective customer in order to get him to buy the goods, the last being a matter that must necessarily be left largely to the judgment of soliciting employees, and while there is no evidence that the company told him what to say to a customer, there is no doubt that it could have done so had it seen fit. There is an inference from the evidence that it could have confined his efforts to a certain territory if he had chosen to to do so. There is evidence that Farr's relation to the company was the same as Garvin's and that Farr had been assigned a territory.

As before stated, the record shows that Garvin and Wallis in their testimony attempted to favor the mercantile company and testified to a number of conclusions

as to the relationship between the two defendants but when it comes to things that were put in black and white by the parties a somewhat different light is shed upon the transaction. Plaintiff in order to show the relationship between these two defendants was required to rely upon the oral testimony of persons naturally favorable to the defendant company. There seems to be nothing in writing in regard to Garvin's employment except the so-called mortgage or contract that he was required to take from his customers. This writing does not contain any general terms in reference to his employment but shows that his co-defendant had the right to interfere with the details of the work. At the bottom of that portion of the mortgage that we have quoted, supra, under the head of "notice" a reference is made to persons such as Garvin as *"our canvassers."* These canvassers are directed to take contracts from every customer. They were to have "no authority" (the words last quoted being in capital letters) to make any verbal contracts with respect to the property sold. No collector could make any collection from the buyer without producing the paper that the buyer had signed.

There is a strong inference from the evidence that Garvin had no other employment except that with defendant company. This relationship was not of a fixed duration; his services could have been dispensed with at any time his co-defendant saw fit or he himself could have quit on his own initiative. If he was doing the work of the defendant it makes no difference how he was paid or whether his payment was designated as commission or salary, or whether his recompense was by the day, hour or week or fixed upon a percentage basis. He had explicit orders as to how he should conduct the business, that is, he was to go and solicit customers and make agreements only by the use of "mortgages," "leases" or "contracts," which were taken in favor of his employer, and he had no authority to conduct it in any other way. As before stated, there is an inference from the evidence that Garvin was to devote all his time to de-

fendant's business and had no right to sell any other property. He was not an independent dealer nor a dealer at all; he did not buy and resell; all he had power to do was to sell the property of the defendant. There is no claim that in making the sales he could fix the price or dictate contracts or that he became personally responsible to his co-defendant for the payment of any bills of any kind. In taking back the mortgages he was merely acting as agent of the defendant. He had no occupation license in Kansas, the mercantile company did.

We think the fact that Garvin was "breaking in" Farr is a circumstance that must be considered in connection with this point. Farr was a part of defendant's organization and it would seem that in breaking him in Garvin was on a mission of defendant. If Garvin was doing this solely for his own profit or solely as a courtesy to Farr, then it would have no bearing, but from all the evidence there is an inference that he was doing this in part at least for defendant. The mere fact that Farr was along learning the business, under the holding of Aldrich v. Tyler Groc. Co. (Ala), 89 So. 289, cited by defendant, perhaps would not have a bearing, but taking this fact together with all of the other facts in evidence bearing on the subject, a case is presented that is very much different than the Aldrich case on the facts. There was evidence that Farr was working for and being paid by the Mercantile Co.

We have carefully examined defendant's cases on the question of Garvin's agency but find them not in point. They all involve facts showing a much less degree of control by the alleged employer. We think that under the evidence in the case at bar it was a question for the jury to determine whether the relationship of *respondeat superior* did exist between the defendants.

We now come to the question as to whether there was testimony tending to show that Garvin was acting within the scope of his employment at the time he struck plaintiff. As before stated, it was shown that Garvin was in the employ of his co-defendant and using

219 Mo. App.—12.

the automobile with its consent and authority. The evidence shows that at the conclusion of a day's work Garvin would take the automobile with defendant company's goods to a garage. Garvin did not return the goods to the company when he finished his work at night but kept them in his car and would go to defendant company's place of business before returning to his work the next day in case it was necessary to replenish his stock. After having quit soliciting, it was necessary for him to take these goods to a place of safety and in view of the testimony he was so taking them at the time of the collision, with the implied consent of the defendant company. A slight deviation from the master's business does not take the servant from without the scope of his authority. [Ins. Co. v. Ry. Co., 207 Mo. App. 137.] There is no evidence that the garage to which he was going for the purpose of having the tire repaired was not on his route to the garage where he kept his car and to the place where he expected to store defendant company's goods, but there is an inference that it was, for Farr testified that he did not know that Garvin was on his way to have the tire fixed but thought they were going "home." If the unexecuted purpose to stop at the garage to have his tire repaired was a deviation, it was so slight as not to take him out of the scope of his employment. [Ins. Co. v. K. C. Rys. Co., supra.] Garvin, after the work of soliciting business for the company was finished for the day, was on his way to the place where the company's goods were to be stored for the night, and the jury were fully justified in holding that he was doing work of the master at the time, even though he was personally responsible for the goods. But, aside from this, we are of the opinion that there was no deviation in this case. The repairing of the tire would seem to have been within the scope of his employment for the reason that he was conditioning his car so that it could be used in the business in which he was engaged for his master. [Berry on Automobiles, (4 Ed.) sec. 1210.]

As to the question whether plaintiff made out a case on the humanitarian doctrine, the evidence shows that plaintiff and a companion were on their way home from school; that there were children on the sidewalk on both sides of Fifth street, north of Troup. Plaintiff and his companion, with some other boys, were playing "chasing each other" in the front yard of the Freeman residence located at the northwest corner of Fifth street and Troup avenue in Kansas City Kansas. The yard was upon a terrace four or five feet higher than the level of the street. There was a double street car track line on Fifth street, which ran north and south. Troup avenue intersected Fifth street at right angles; south of Troup, but shortly before reaching Troup and about a street car's length from Troup, the car line veered off to the right and in a northeasterly direction so that there were no street car tracks on Fifth Street north of Troup. There was a jog in Troup avenue as it crossed Fifth so that the front steps of the Freeman property faced Troup avenue extended east of Fifth Street, Troup avenue west of Fifth street being somewhat south of the same street east of Fifth street. Fifth street was fifty feet in width and the paved portion of the sidewalk, exclusive of the parkway, was six feet in width. Garvin was driving his car south upon Fifth street. As his right front fender struck plaintiff and plaintiff was found in the middle of the street, there is an inference from the evidence that he was driving upon the left or wrong side of the street. There was testimony that he was driving at the rate of fifteen miles an hour and that his car under the circumstances could have been stopped within twelve feet, the street being dry and the grade on Fifth street toward the south being very slight. He testified that he was driving from eight to ten miles an hour.

Plaintiff lived south of the Freeman house and it was his intention to take a street car to go home, and hearing one coming he started to catch it. Its stopping place was immediately southeast of the southeast cor-

ner of Fifth and Troup and just east of the sidewalk on the east side of Fifth street. He walked until he arrived at the west curb and then trotted to the point where he was hurt. Farr testified that he first saw plaintiff when he came off the terrace; that there was a *"little* one-horse wagon" standing at the curb between the on-coming automobile and the point where plaintiff was struck; that the wagon faced north; that plaintiff ran south of this wagon and continued to come forward, running as hard as he could and ran into the right side of the automobile. Describing the wagon he testified "that it was a small one-horse wagon standing *right in close."* Garvin testified—

"I noticed some boys playing on that terrace; I paid no further attention to them. I suppose I was fifty, may be seventy-five, feet away and those boys attracted my attention by playing on the terrace, and I never slackened my speed, I drove just like I was driving, may be ten miles, may be eight and may be twelve, I wasn't going very fast and when l got opposite this wagon, or just before I got to the wagon, one of the little boys must have run down off the terrace."

That when plaintiff reached within two or three feet from his automobile, he swerved it to the left and missed him with the front of his car; that he did not see plaintiff run into the car. He testified that plaintiff came from behind the wagon but that he did not see him until he emerged from behind it. He testified that he was looking down the street. When he first saw the boys on the terrace, he did not anticipate that any of them would run off. There was other testimony that the front end of the car struck plaintiff and that no warning signal was given; that the car did not slacken or swerve to one side or turn aside prior to the time it struck plaintiff and that it ran about sixty feet after that time before it stopped.

Plaintiff testified that he looked to the south but did not look to the north and did not see or know that the automobile was approaching. The automobile was

thirty feet from plaintiff at the time plaintiff started to cross the street. When plaintiff left the sidewalk he was a little more than seven feet to the south of the wagon.

We think that under the circumstances there was a case under the humanitarian doctrine. [Kinnison v. Weiss, 261 S. W. 336.] What Farr saw, Garvin could have seen. While Garvin was not required to anticipate that any of the boys would run off the terrace into the street until he actually saw plaintiff doing so, Farr testified that he saw the boy come off the terrace and come into Fifth street south of the wagon, when the witness hollered. There is no question but that plaintiff manifested every intention of crossing the street when he came into the roadway; whether he was running as fast as he could as was testified to by Farr or merely trotting, he was moving with his face toward the east and did not see the automobile and manifested every indication that he was oblivious to his peril. It is apparent that the *little* wagon and horse were but a slight obstruction and did not materially interfere with the view of the occupants of the automobile, as Farr saw the whole occurrence. There was ample time under the testimony for Garvin to have stopped his car. If he could have stopped it within twelve feet going at the rate of fifteen miles an hour, he could have stopped within much less space going at the rate of eight miles per hour. Aside from this it was his duty to give some warning of his approach or to have swerved his car aside when he saw, or could have seen, plaintiff's obliviousness to his dangerous position. [Hornbuckle v. McCarty, 243 S. W. 327, 329.] It was not only the duty of the driver of an automobile to look straight ahead but "latterly ahead." [Hornbuckle v. McCarty, supra.]

At the conclusion of plaintiff's cross-examination of defendants' witness Wallis, plaintiff asked him if he had not made certain answers to certain questions when his deposition was taken. Objection was made to these answers for the reason that "it is not competent to

question a witness unless his testimony differs from that in the deposition.'' It is now insisted that the questions and answers read the witness did not tend to contradict his testimony at the trial. We think there is no merit in this contention. Wallis testified at the trial that Farr was working for Garvin and in his deposition he said that Farr's ''employment was the same as that of Garvin;'' that he was fully broken in afterwards and territory turned over to him. Wallis at the trial attempted to make it appear that Garvin was an ordinary retail merchant and that he was handling his codefendant's goods on consignment. In his deposition Wallis testified that sometimes goods were furnished to Garvin before the sales were made, and sometimes the company had him *merely take orders.* There is no question but that the deposition contradicted the witness. Plaintiff afterwards read the deposition in full to the jury. This was proper. [Prewitt v. Martin, 59 Mo. 325, 334; State v. Mathews, 88 Mo. 121; Wilkerson v. Eiler, 114 Mo. 245.]

Plaintiff's father testified that there was a grade on Fifth street, north of Troup, sloping from north to south; that ''north of this place is a little higher than south of it, I judge about three per cent.'' That he understood ''what percentage of grades means;'' that it meant so many feet in 100; that what he meant was that the slope was three feet in every 100 feet. He testified that he had no experience in surveying or engineering. Objection was made to his testimony because it was not the best evidence and that he was not qualified; that the grade should have been shown ''by someone who knows exactly what the grade is.'' There was no error in the court's overruling defendants' objection to the testimony. The matter of grades of roads and streets is one of such common knowledge and observation that it does not require a survey by an expert to determine what such a grade ordinarily is. [See Wise v. Railroad, 135 Mo. App. 230; Hill v. Jackson, 265 S. W. 859.] In the case at bar it was not a question of tech-

nical exactness but only the approximate exactness of the grade. This testimony, together with the other facts submitted to plaintiff's expert witness, Clack, as to in what distance the automobile could have been stopped under the circumstances, was sufficient upon which to base his opinion.

Physicians, who had examined plaintiff, were placed upon the stand by defendants and testified that there was no fracture of the bone to affect plaintiff's hearing; that they had not examined an X-ray photograph which would have shown the situation for the reason that none was taken. In rebuttal plaintiff's mother was allowed to testify that one of these physicians took the boy to an X-ray specialist for an X-ray photograph. Defendants insisted that this testimony in rebuttal, which was objected to, was not proper rebuttal. It is admitted that while the trial court has a wide discretion in admitting rebuttal testimony the discretion in this instance was abused. We think not. The testimony in rebuttal had a hearing upon the fairness of the physicians, especially the one who had the X-ray photograph taken.

Complaint is made of plaintiff's instruction No. 1. The main complaint of this instruction is the giving of it while the court at the same time refused defendants' instruction No. 8, which reads as follows:

"If the jury find and believe from the evidence that at the time of the accident plaintiff ran into and collided with said car, then he cannot recover in this case and the verdict should be for both defendants herein."

It is insisted that the court did not submit to the jury defendants' theory of the case and plaintiff's instruction entirely ignored the defense that plaintiff ran into the automobile. Plaintiff's instruction covers the entire case and directs a verdict and concludes by telling the jury that if it found the facts herein hypothesized, they should find for plaintiff "although you may believe that plaintiff himself was negligent at the time and place in question." We think there was nothing

wrong with plaintiff's instruction; it assumes no disputed fact and while it submits to the jury the question as to whether Garvin was acting within the scope of his employment at the time he struck plaintiff, there was ample testimony for the jury's consideration on this point. It submits to the jury whether or not plaintiff was in a position of danger and oblivious thereto and whether Garvin saw or by the exercise of ordinary care could have seen plaintiff's said position and obliviousness in time by the exercise of ordinary· care to have stopped the automobile or to have turned the same aside, and submits whether the automobile struck plaintiff and was run against him and whether it knocked him down. The instruction was a fair and usual one and in the approved form. It had the jury find that the automobile struck plaintiff although it did not directly refer to the evidence that plaintiff ran into the automobile. It was not necessary for it to have alluded in specific terms to this matter for many reasons (State ex rel. v. Hope, 102 Mo. 410, 426; Meily v. Railroad, 215 Mo. 567, 569), the main one being that had the jury found the facts attempted to be submitted in defendants' refused instruction No. 8 by themselves, they would not have been a defense, and for this reason instruction No. 8 was properly refused. Plaintiff was entitled to recover even if he ran into the side of Garvin's car if he was oblivious of its presence, which Garvin saw or should have seen in time and failed to swerve the car aside or sound a warning in time to have avoided the collision, even though he could not have stopped the car. [Hornbuckle v. McCarty, supra, 1. c. 329.]

In this connection it is again insisted that there is no evidence upon which the court could have submitted the last-chance doctrine. From what we have said there is no merit in this contention. There is also no merit in the contention that the instruction is ambiguous in that it is not plain whether the phrase "that he was oblivious thereto in time thereafter" refers to the finding of the jury of such obliviousness or to the seeing of it

by Garvin. Grammatically and otherwise, it refers to the seeing of it by Garvin.

There is no inconsistency between plaintiff's instruction No. 1 and defendants' instruction No. 7. This instruction of defendants' submits the reverse of the humanitarian part of plaintiff's instruction. It has the jury find that if the facts were the reverse of those submitted in plaintiff's instruction on this point, they should find for the defendants, and refers entirely to the conduct of Garvin and covers only the negligence or lack of it on his part and is not on the question of contributory negligence. If it had mentioned contributory negligence, it would have been refused and properly so as was defendants' instruction No. 7, because that instruction told the jury that if plaintiff was guilty of contributory negligence, he could not recover. There is no inconsistency between the instructions given. From what we have said there was no error in the refusal of defendants' instruction No. 7.

Complaint is made of the refusal of defendants' instruction No. 9. It is claimed that this instruction sought to submit to the jury the legal effect of plaintiff's exhibit No. 7. This exhibit was the form of a chattel mortgage used by Garvin in selling the company's goods. But the instruction does do as claimed. It merely sought to tell the jury that exhibit No. 7 did not contemplate the signing of it by the defendant company. This, it seems, would have been a comment upon the testimony and the effect of it would have been to leave the inference that Garvin was not in the employ of his co-defendant.

Complaint is made of the refusal to give defendants' instruction No. 10. This instruction sought to tell the jury that if at the time of the collision "Garvin was not . . . engaged in selling or attempting to sell any goods for said company under his employment as such salesman, but had previously quit work, then the verdict should be for the defendant, L. B. Price Mercantile Company." As we have already stated, the mere

fact that Garvin had quit the actual work of selling or attempting to sell his co-defendant's goods at the time he struck plaintiff, would not remove him from out of the scope of his employment. He was on his way to a place where his employer's goods were kept for the night and to a garage in order to have repaired the automobile which he used in promoting the work of his employer.

The judgment is affirmed.    All concur.