51 So.2d 381

### PHILABERT v. FRAZIER.

4 Div. 161.

Court of Appeals of Alabama.

Dec. 19, 1950.

Rehearing Denied Jan. 30, 1951.

550

Frank J. Tipler, Jr., of Andalusia, for appellee.

CARR, Judge.

This cause of action is predicated upon a collision between plaintiff's car and an automobile driven by one Paul W. Gilliam.

In the court below there was a verdict and judgment in favor of the plaintiff.

Mr. Gilliam freely admitted at the trial that he was driving while intoxicated and that he negligently ran into appellee's car.

There are several questions posed for our review. However, we have reached the conclusion that Mr. Gilliam was an independent contractor in his relationship with the appellant. This will be decisive of this appeal, and a consideration of other presented questions will be pretermitted.

At the time of instant concern the appellant was engaged in the manufacture and sale of chemicals for treating and sterilizing water. The main source of outlet for this material was ice manufacturing establishments. The chemical plant and shipping point were at Birmingham, Alabama.

Mr. C. W. Gilliam, father of Paul, and a Mr. Bankston had been salesmen for the appellant for several years. Their territory was confined to three southern states, including Alabama. They sold the chemicals on a twenty-five per cent commission basis, furnishing their own transporta-

Edw. F. Reid, of Andalusia, for appellant.

tion and paying their own expenses incident to their travel.

Four or five months before the collision, the elder Mr. Gilliam and Mr. Bankston agreed to give Paul some of their territory for the sale of the chemical on the same basis of employment that they had with the appellant. The father gave his son instructions in the nature and technique of the sales business and introduced him to some of their customers.

Paul began the sales with the knowledge and approval of the appellant, but it appears that the latter had no part in the initial arrangement and did not in any manner designate nor direct the territory over which Paul was to travel. This it seems was left entirely to an agreement between the father, son, and Mr. Bankston. The appellant made no requirement as to the method of Paul's travel while covering his sales territory.

At the time Paul began his sales activities, he was living in Montgomery, Alabama, and was employed by the Louisville and Nashville Railroad Company as a brakeman on the extra board. This residence and employment continued up to the time of the collision in question. He sold the chemicals only when his railroad employment duties did not demand his time, and did not have any agreed or specified days to attempt to make sales.

He used his own car for travel and paid all costs for its operation. He had no expense allowance or advances. In short, the twenty-five per cent commission on his sales was his only remuneration. This was paid by the appellant by check at the end of each week if any sales had been made during the prior week. No Federal income tax was withheld.

The orders he secured were mailed to appellant's office in Birmingham, and from there the merchandise was shipped directly to the purchasers. Payments were made by the customers to the home office.

The appellant testified that on a few occasions he loaned Paul small sums of money. These were rare incidents, and no record was kept of these loans on the company books.

The elder Mr. Gilliam furnished his son with some literature and order blanks which he had gotten from the appellant. The latter reserved the right to fix the prices of the chemicals and to refuse shipment if the purchaser's credit was not satisfactory. It appears, however, that the right of this refusal was not required in the case of any of Paul's orders.

The appellant sold Paul a testing machine. This was used to test the water at the ice plants to ascertain the needed chemicals. This machine, some literature, and a supply of order blanks were found in Paul's automobile after the wreck.

We have attempted to set out fully and fairly the evidence relating to the circumstances of the employment.

In determining the question of instant concern, it may be generally stated that the distinguishing characteristic of the relationship is the degree or nature of the retention by the master of the right to control the manner in which the details of the servant's work are to be done. If this right to control is left solely to the person hired, in the absence of other controlling circumstances, the servant must be regarded as an independent contractor and not as an agent of the employer. Republic Iron & Steel Co. v. McLaughlin, 200 Ala. 204, 75 So. 962.

It is not the fact of actual interference, but the right to control, that makes the difference between an independent contractor and a servant or agent. Burgess v. Garvin, 219 Mo.App., 162, 272 S.W. 108.

Perhaps the most logical and helpful approach to the matter at hand is to review some of the cases in which facts appear analogous to those in the case at bar.

In the opinion in the case of Aldrich v. Tyler Grocery Co., 206 Ala. 138, 89 So. 289, 290, 17 A.L.R. 617, these facts and conclusions appear: "Shook was the grocery company's 'city salesman.' He alone owned and maintained the automobile causing the injury. He was compensated on a commission basis. He was paid a percentage on orders taken and accepted. He received payment of bills due the grocery company and delivered such payments to

it. The grocery company was only concerned in the result of his efforts as salesman. It did not control when, how, or where he secured these orders, except he was not to work another salesman's trade in the territory he (Shook) was entitled to work. The method, means, and occasions of his calls upon the trade was left entirely to him, uncontrolled by the grocery company. The facts that he was lame, that the company knew this fact, that the company knew when he first was engaged that he would and did afterwards visit the trade in a car of his own, maintained alone by him, and that on this occasion Page, his associate or successor as city salesman, was in the car when the injury occurred, did not operate, singly or otherwise, to change Shook's relation' from that of an independent contractor to a servant to the grocery company as master in the operation of Shook's automobile on this occasion."

Justice Foster delineated these facts in the case of General Refrigeration Sales Co. v. Taylor, 229 Ala. 479, 158 So. 314: "Defendant was engaged in the business of selling and distributing the refrigeration plants manufactured by General Refrigeration Company, a company distinct from defendant. Defendant had employed C. W. Young as a salesman for it. He had a certain territory in which to solicit business, and received a salary and commissions, and had a drawing allowance against his commission account. He paid his own expenses and selected his own manner of soliciting business and method of transportation. He owned an automobile which he used as occasion required, but it was in no way connected with his employment. He sometimes traveled on the trains and busses, and sometimes walked. Defendant made no suggestion or requirement about that nor as to any of the details to be observed by him. He paid all his expenses personally, including the purchase, operation, and upkeep of his car. His commission was on the amount of his sales, and defendant had no right under the contract to control the methods he used or his transportation facilities. He had no right to bind defendant by any contract of sale either for cash or on credit. They were all to be and were submitted to defendant for approval, and were so approved before they were binding."

On the basis of this evidence, the Justice, observed: "If the injury to plaintiff had occurred in and about the sale of defendant's goods under the terms of such an arrangement, it would have imposed no liability on defendant."

The appeal was again before the Supreme Court and this case is reported in Taylor v. General Refrigeration Sales Co., 231 Ala. 469, 165 So. 572. Justice Knight, writing for the court, elaborated further on the evidence relating to the matter of agency. The court adhered to its former view and held that the driver of the damnifying car was an independent contractor.

In the case of Greenwald v. Russell, 233 Ala. 502, 172 So. 895, the Supreme Court held that the relationship of independent contractor existed under these circumstances: The driver of the offending vehicle was at the time of the injury operating his own car. He paid the costs of its operation and his personal expenses. He worked as a salesman solely on a commission basis. He selected the time, and went where he chose within the assigned territory in search of customers. The defendant company gave him no instructions as to his mode of travel.

In Dohner v. Winfield Wholesale Grocery Co., 116 Kan. 237, 226 P. 767, a salesman for a grocery company was paid a minimum salary of $175 per month, his compensation to be increased in the proportion that his sales should exceed the minimum amount. He operated an automobile which he owned and at his own expense. His movements in the execution of his sales were not controlled by his employer, except that he was required to make his territory once each week. Under these circumstances with respect to the operation of his automobile he was held to be an independent contractor.

The relationship of independent contractor was held to exist in the case of Howitt v. Hopkins, 219 App.Div. 653, 220 N.Y.S. 462, under these circumstances:

The salesman was employed to sell adding machines, for which he received a commission for sales made in his assigned territory. He used his own car and paid the expenses of its operation. The court observed that the adding machine company was interested in the number of sales and in securing the proceeds, but not interested in the methods by which sales were made or in any preliminary details.

A company employing a salesman on a salary and commission, in the case of Pyyny v. Loose-Wiles Biscuit Co., 253 Mass. 574, 149 N.E. 541, was held not liable for damages caused by a collision with its salesman's automobile, where the salesman furnished his own car, the company paying him so much a mile for operating expenses, and having no right to direct the manner in which he controlled the vehicle.

In the case of James v. Tobin-Sutton Co., 182 Wis. 36, 195 N.W. 848, 29 A.L.R. 457, an automobile salesman was held to be an independent contractor who sold cars on commission and who used his own automobile and financed its operation. The facts disclose that the salesman employed his time at his pleasure, but was required to call at headquarters each morning for instructions, suggestions, and criticism. At this meeting, the work of the previous day was discussed and prospect cards were delivered to the salesmen in attendance.

We think that we have sufficiently reviewed the authorities to illustrate our view that Paul Gilliam in the instant case was an independent contractor.

In brief of appellee's counsel, much emphasis is directed to a tendency of the testimony to the effect that the appellant reserved the right to terminate the services of the salesman, and it is insisted that this proof, alone, was sufficient to present a jury question as to whether the relationship was of master and servant or independent contractor at the time of the collision. This position is predicated primarily on this testimony of Paul Gilliam:

"Q. Mr. Philabert had a right to say who worked for him? A. Yes, sir.

"Q. Mr. Philabert hired you, didn't he? A. Yes, sir.

"Q. And Mr. Philabert had a right to fire you? A. No, sir.

"Q. He couldn't stop you selling his line of products? A. He could refuse to.

"Q. He could refuse to allow you to sell his products, couldn't he? A. Yes, sir.

"Q. Wouldn't that be tantamount to firing you?

"Mr. Reid: We object.

"The Court: Sustain it.

"Q. If he refused to allow you to sell them you couldn't call on the customers and sell them, could you?

"Mr. Reid: We object.

"The Court: Overrule it.

"A. Well, naturally you couldn't sell any products if a man refused to let you sell it.

"Q. And therefore he had a right to refuse to allow you to sell his products? A. Yes.

"Q. And he had a right to set the price on the products you sold? A. Yes.

"Q. And he had a right to assign a new man in this territory if he wanted to? A. Yes, sir.

"Q. And he had a right to tell you to sell somewhere else or quit selling? A. He didn't tell us that.

"Q. He had a right to tell you if he wanted to? A. I can't make up his mind."

These statements should be interpreted fairly and reasonably. The terms and conditions of the employment all rested on a parol agreement. The statements of the witness were based solely on his conception of the rights of the appellant in respect to matters about which the evidence relates.

■ Even so, we do not think that the matter of the right to terminate the employment is alone conclusive of the question of whether or not the relationship of independent contractor exists, in the absence of other evidence of control or right to control. This is expressly held in: Griffith v. Electrolux Corp., 176 Va. 378, 11 S.E.2d 644; American Nat. Ins. Co. v. Poole, 24 Tenn.App. 596, 148 S.W.2d 14;

Reiling v. Missouri Ins. Co., 236 Mo.App. 164, 153 S.W.2d 79; Houdek v. Gloyd, 152 Kan. 789, 107 P.2d 751; Hempstead v. Toledo Scale Co., 270 Ill.App. 299.

We do not construe Judge Samford's statement in Daves v. Rain, 28 Ala.App. 54, 178 So. 59, and Justice Bouldin's comment on certiorari, 235 Ala. 82, 178 So. 63, 66, to mean that the power to discharge at will is alone a determining factor. In fact, the contrary view seems to be expressed in the latter opinion: "The power to discharge in terms may often be considered in aid of construction, but is not sufficient to determine the relation. The same applies to manner of payment. *The true test is control by the master over the manner and means of performance.*" (Emphasis ours.)

It should be noted that the Supreme Court granted the writ of certiorari to the Court of Appeals and held that the relationship of the parties concerned was that of independent contractor.

It is clear that the case of Martin v. Republic Steel Co., 226 Ala. 209, 146 So. 276, is not controlling to sustain appellee's position. A consideration of the authority will demonstrate that under the facts and proceedings we do not have analogy to the case at bar.

Appellee also cites and comments on the case of Luquire Ins. Co. v. McCalla, 244 Ala. 479, 13 So.2d 865. Justice Foster delineates the tendencies of the evidence in the opinion. It is evincingly clear that the circumstances there are not comparable to those in the instant case.

Appellee in brief places much emphasis on the holding in the case of Moore-Handley Hardware Co. v. Williams, 238 Ala. 189, 189 So. 757.

There are a number of important factors and elements in this case which are not found in the record in the case at bar. We will state some of these: McClinton, the driver of the offending vehicle, was required to work one day a week as a salesman on the floor of defendant's business establishment. He was expected to attend sales meetings each morning, at which time the technique and manner of selling the defendant's goods were discussed. He was required to sell the radios according to a fixed and prescribed method. At times the company manager would tell and direct McClinton as to the kind of radio the company would like to sell to a particular prospect. The defendant company kept the names of persons who had called at the store or over the telephone and who had evinced interest in buying a radio. The names of these prospective customers were delivered to McClinton and other salesmen. These and other circumstances disclosed by the evidence, in our view, clearly distinguish the case from the one we are now reviewing.

We fail to find in the case at bar facts or reasonable inferences from the evidence that authorize us to conclude that the appellant retained any right to direct the manner in which the sales of Paul Gilliam were accomplished so as to bring the relationship under the doctrine of master and servant.

For error in refusing the general affirmative charge in defendant's behalf, the judgment of the court below is ordered reversed and the cause remanded.

Reversed and remanded.

#### On Rehearing.

Appellee's counsel in brief on application for rehearing urgently requests us to set out certain portions of testimony appearing in the record. We realize that this will extend this opinion to undue length, however, out of deference to this insistence, we will comply with the request, omitting the objections of counsel and rulings thereon.

Testimony of Vester Gamble:

"Q. Who did Mr. Paul Gilliam work for in January, 1944?

"Q. Do you know who he worked for? A. Yes, sir.

"Q. Who did he work for? A. Chemical Solvent Company."

"Q. Is that the same Paul Gilliam that you stated was the representative of Mr. Frank Philabert doing business as Chemical Solvent Company? A. Yes, sir."

"Q. Did he have any equipment in there that you recognized? A. He had equipment that he checked your brine for acid, etc.

"Q. Now you had seen that same equipment before? A. Yes, sir.

"Q. Where had you seen it before? A. He brings it in with him.

"Q. When he calls on you? A. Yes, sir.

"Q. And checks your brine? A. Yes, sir, that is his regular routine.

"Q. You say you saw an order book in the car that night when you pulled him out? A. Yes, sir.

"Q. Was that an order book for the Chemical Solvent Company? A. Yes, sir.

"Q. You had seen that order book before? A. Oh, sure.

"Q. And you had seen him write orders in that order book? A. Yes, sir.

"Q. Were those orders that you saw him write for Frank Philabert doing business as Chemical Solvent Company? A. Yes, sir."

"Q. Mr. Gamble, this morning you testified that Paul Gilliam was employed by the Chemical Solvent Company, and that he called on you as representing them at the time of this accident."

Testimony of Paul Gilliam:

"Q. And as a result you would call on them about the time they needed some? A. Yes.

"Q. And as a result your trips would be about the same every time? A. No, sir.

"Q. You would come about once a month or once every two months? A. We tried to.

"Q. As best you could you tried to make that regular schedule? A. Yes, sir.

"Q. That was to your benefit and people you sold to? A. Yes, sir.

"Q. And the Chemical Solvent Company?

"Q. That was so you could sell more of their chemicals? A. Yes."

"Q. That's right. In the course of studying that you were studying Mr. Philabert's particular products? A. Yes.

"Q. So you could be in better position to sell them to the people you were going to sell? A. Yes.

"Q. And your father and Mr. Philabert helped train you? A. My father did, not Mr. Philabert.

"Q. Mr. Philabert talked to you about his line and how much commission you were to get? A. Yes.

"Q. Mr. Philabert owned that business? A. I suppose so, yes.

"Q. And you had to sell what Mr. Philabert had to deliver? A. Yes, sir.

"Q. You couldn't sell anything except what Chemical Solvent Company could deliver to the customers, could you? A. No, sir.

"Q. Therefore Mr. Philabert had to let you know what to sell? A. We knew what products he handled, yes, sir, and we sold their products.

"Q. And he gave you literature? A. Yes.

"Q. He set the prices? A. Yes, sir.

"Q. You didn't set the prices you sold? A. No, sir.

"Q. You just drew a commission for selling it? A. Yes.

"Q. For the products you sold you would send in an order? A. Yes.

"Q. Send it to Mr. Philabert doing business as Chemical Solvent Company? A. Yes, sir.

"Q. He would deliver the order? A. Yes, sir.

"Q. And Mr. Philabert would pay you? A. Yes, sir."

"Q. These orders that you sent in for these different concerns, you would go to these different points by automobile, wouldn't you? A. Yes, sir.

"Q. And the Chemical Solvent Company office knew you wasn't walking to those three states?

"Q. Don't you think they knew you wasn't walking? A. I suppose they did.

"Q. Don't you know they supposed you were riding in an automobile? A. Yes, sir."

"Q. When you made calls and called on a customer, did it happen that maybe times these customers after you made a call would send in an order through the mail? A. Yes, sir.

"Q. Would you get credit for that order? A. Yes, sir.

"Q. Would you get commission on that sale? A. Yes, sir."

"Q. You say any customer or anybody that sent in an order to the Chemical Solvent Company in Birmingham in your territory you got a commission for it? A. Yes, sir.

"Q. Whether you went to see him or not? A. If I called on him one time or another.

"Q. You got the commission whether you sold him at that particular time or not? A. Yes."

Testimony of C. W. Gilliam:

"Q. Mr. Philabert knows you traveled by car, doesn't he? A. Yes."

"Q. He has a right to determine the type men that is going to sell his products? A. That is entirely in Mr. Philabert's province."

"Q. You say you know all of that? A. I said I know that he divided the commissions with me.

"Q. You know how he and Mr. Philabert handled the commissions after that? A. No."

Testimony of W. L. Bankston:

"Q. His arrangement with Paul Gilliam was if he sent in an order that wasn't acceptable to Mr. Philabert, Mr. Philabert could turn the order down? A. Yes."

Testimony of Frank Philabert:

"Q. Did somebody else decide who was to represent your Company? A. No, sir, it was strictly my own."

"Q. When a sale is made by Mr. Gilliam or when one was made by Paul Gilliam to anybody it was up to you to collect from the customer, wasn't it? A. Yes, sir."

"Q. Mr. Gilliam didn't do the collecting? A. No, sir."

"Q. If Paul Gilliam sent an order in from Vester Gamble and you had not wanted him to sell to Vester Gamble you could have refused to ship it, couldn't you? A. I imagine so."

Testimony of Walter Gamble:

"Q. Did he come to visit you on regular intervals? A. Yes, sir.

"Q. And took orders on order blanks for Chemical Solvent Company? A. That's right.

"Q. How long, in your judgment, would you say he made those calls prior to January 3, 1944? A. For several months. It would be hard to say the amount of time but several months.

"Q. In your judgment was it close to a year? A. I would think so.

"Q. When he would come would he do anything other than take orders? A. Yeah, he would check the brine. They had a brine apparatus that they would check your brine to see what you needed in that, and check that with the idea of selling chemicals for water treatment.

"Q. That was a service that he would regularly perform with a machine? A. That was free service they did to tell whether you needed the stuff or not.

"Q. Any orders that you all gave him were filled? A. Yes, sir.

"Q. Who did you pay for them? A. Chemical Solvent Company."

Testimony of Vester Gamble:

"Q. Prior to January 3, 1944, did Paul Gilliam take orders for the Chemical Solvent Company of Birmingham? A. Yes.

"Q. Did he do that on more than one occasion? A. Yes, sir. In fact he took care of our needs there for about a year.

"Q. For about a year he took care of your needs for the Chemical Solvent Company? A. Yes, sir."

"Q. Mr. Gamble, did Paul Gilliam go to work with the railroad company after this collision? A. That was my knowledge that he went to work for the railroad after that time.

"Q. And wasn't working for them at that time? A. No, sir."

"Q. You say you wouldn't have given him any orders if you hadn't known he was working for the Chemical Solvent Company? A. Sure. He knows he was working for them."

This evidence was carefully considered by us when we prepared the original opinion. We still entertain the view that the defendant was entitled to the general affirmative charge.

The application for rehearing is overruled.